IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **VICKIE S. PENNINGTON,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Civil No. 09-973-JPG-CJP** |
| | ) | |
| **MICHAEL J. ASTRUE**, | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT and RECOMMENDATION

This Report and Recommendation is respectfully submitted to United States District

Judge J. Phil Gilbert pursuant to **28 U.S.C. § 636(b)(1)(B)**.

In accordance with **42 U.S.C. § 405(g)**, plaintiff Vickie S. Pennington seeks judicial

review of the final agency decision finding that she is not disabled and denying her Disability

Insurance Benefits (DIB) pursuant to **42 U.S.C. § 423**.

## Procedural History

Ms. Pennington filed an application for DIB on December 18, 2006.  The application was

denied initially and on reconsideration.  At plaintiff's request, a hearing was held before

Administrative Law Judge (ALJ) Zane A. Lang on September 9, 2008.  (Tr. 29-49).  ALJ Lang

denied the application for benefits in a decision dated September 24, 2008.  (Tr. 9-28).

Plaintiff's request for review was denied by the Appeals Council, and the September 24, 2008,

decision became the final agency decision.   (Tr. 1).

Plaintiff has exhausted her administrative remedies and has filed a timely complaint in

this court.

**Issue Raised by Plaintiff**

Plaintiff raises one issue, that is, that the ALJ erred in not finding that her impairment meets or equals Listing12.07, Somatoform Disorders.  See, Plaintiff's Brief, Doc. 18, p. 6.

Defendant filed a brief at Doc. 22.

**The Evidentiary Record**

The Court has reviewed and considered the entire record in formulating this Report and Recommendation.  The following is a summary of some of the pertinent portions of the written record.  The review of the record will focus on the narrow issue raised by plaintiff.

**1.      Plaintiff's Testimony**

Plaintiff was represented at the hearing by an attorney.

Ms. Pennington was 55 years old at the time of the hearing.   She has a GED.  Her husband supports her.  He is disabled and on Social Security.  (Tr. 36).

Plaintiff last worked in 2006.  She worked for a number of years in a Maytag factory, inspecting washers and dryers and replacing bad parts.  After an injury, she was unable to do the work.  She stopped working in July, 2006.  The plant closed in December, 2006.  (Tr. 32-36).

While working at Maytag, plaintiff fell from a lift onto a concrete slab.  She was knocked unconscious and hurt her back.  She testified that she hurt her low back and that she has a "crushed disc" in her cervical spine.  Surgery has not been recommended.  She made a Workers Compensation claim, for which she netted $16, 016.  (Tr. 37-38).

She testified that she is in pain every day.  On bad days, she cannot walk very well because she cannot keep her balance.  She has frequent muscle spasms.  She testified that her doctor told her not to drive due to these spasms.  She also has "severe headaches."  She can sit

for only 15 to 30 minutes.  She cannot stand for 6 out of 8 hours, even on a good day.  She also has pain in her neck and pain radiating down her arms.  (Tr. 39-40).

On a typical day, plaintiff does dishes, "light dusting," and laundry.  She has a driver's license.  Her husband or daughter take her to doctors' appointments.  She does not go grocery shopping.  (Tr. 36).

**2.     Testimony of Vocational Expert**

June Hagan, Ph.D, testified as a vocational expert.  (Tr. 29).

The ALJ asked the VE  to assume a person who could often lift 10 pounds, occasionally lift 20 pounds, sit/stand/walk for 6 out of 8 hours, and who must avoid concentrated exposure to environmental irritants.  The VE testified that this person would be able to do plaintiff's past work of factory assembler.  This was the "light duty" job which she performed after her injury. (Tr. 46-47).

**3.     Disability Report (Tr. 109-117)**

Plaintiff stated in the Disability Report that she was unable to work because of a crushed disc in the lower back, compression fracture, bulging disc in neck, myofascial pain syndrome, arthritis, osteoporosis and COPD.  These conditions first interfered with her ability to work on September 29, 2004.  She stopped working on July 20, 2006.  The stated reason is "doctor took off work."  (Tr. 110).

**4.     Activities of Daily Living Questionnaire (Tr. 118-120)**

Ms. Pennington stated she has no problem using kitchen tools or tending to personal hygiene, including washing her hair.  She also claimed that she cannot reach overhead due to pain, and that she has difficulty walking, getting up from a chair or out of bed, and going up and

down stairs due to pain in back and hip.  She stated she can sit for only 15 - 20 minutes, and

must rest about 3 times per hour during any activities.  She does housework and shopping, but

she needs her daughter's help.  She stated that she does no yardwork.  (Tr. 118-120).

**5.**     **Medical Records**

Dr. Mark Smith of Logan Primary Care is plaintiff's primary care physician.  Plaintiff

saw Dr. Smith on May 9, 2006, for anxiety.  She reported that she was stressed out due to her

husband's ill health and a "blow up" with her supervisor at work 2 weeks earlier.  She was upset

about cutbacks in her department and the fact that her quota had been increased.  Dr. Smith

diagnosed anxiety and prescribed Lexapro.  (Tr. 173).  By June 6, 2006, she reported that she

was less stressed out and was ready to return to work.  (Tr. 172).

Plaintiff alleges that she became disabled as of  July 20, 2006.  On that date, she told Dr.

Smith that, since she had been "back on line, wiring and pushing," she was again having

headaches and back pain.  She related this to an injury which had occurred back in September of

2004.  He noted that her back pain began in 2004, had gotten better, but was worse since she had

gotten assigned to a more difficult job.  On examination, she had normal posture and gate, a full

range of motion without significant guarding, but some tenderness in the paravertebral and

trapezius areas.  (Tr. 237).  Dr. Smith diagnosed cervical and trapezius strain, and numbness in

the right hand.  He referred her for physical therapy.  (Tr. 238).

 Ms. Pennington began seeing physical therapist Rob Landes on July 24, 2006.  She

reported that she had fallen 2004 and that, since then, she feels good when she takes it easy.  The

therapist noted that this "concerns her because she enjoys an active lifestyle in her garden."  (Tr.

229).  Ms. Pennington told him that "if her Maytag job were not going away she could tolerate

the symptoms but as the plant was closing she could not rely on her seniority to allow her to perform jobs that were within her perceived abilities." (Tr. 230).  After testing and examination, he noted overreaction and disproportionate reaction, and 5 out of 5 positive Waddell's signs.  He concluded that her potential to improve was poor and that the exam failed to confirm organic pathology.  (Tr. 230).

On August 15, 2006, after 9 therapy treatments, the therapist noted that plaintiff had made no significant functional improvement.  She had  worked in the yard for a few hours, which increased her symptoms.  The therapist noted that, while she seemed to be sincere, there were "many inconsistencies" in the exam, which could indicate "non-organic contributions to her pain syndromes."  (Tr. 222).

On October 2, 2006, after 26 therapy sessions, the therapist noted inconsistencies in plaintiff's behavior in that she was guarded when transferring from a chair or reaching for her purse, but was able to lower herself on to the therapeutic ball with little or no guarding and no complaints.  (Tr. 202-203).

Throughout this period, plaintiff saw Dr. Mark Smith regularly.  He continued to note tenderness of the neck and left trapezius, with full range of motion of the cervical spine, "intact" lumbar motion, and a normal gait (Tr. 200, 208, 216, 220, 227, 233, 237).  X-rays of the cervical spine on July 21, 2006, were negative, with no evidence of fracture or subluxation.  (Tr. 248).  An MRI of the cervical spine on September 1, 2006, showed degenerative disc disease with mild protrusion of the disc at C5-C6.  An MRI of the lumbar spine on the same date showed spondylosis of T12-L1 and mild degenerative disease of L3-4.  There was also mild to moderate deformity of the endplate of T-1, which was interpreted as "possible representing early

osteoporotic compression fracture." (Tr. 245- 246).  Nerve conduction  testing of the upper

extremities was normal (Tr. 178, 651). Dr. Smith repeatedly indicated that Ms. Pennington could

return to "transitional/light duty" work (Tr. 213, 219, 226, 232, 235-36, 238).

Dr. James T. Doll performed an independent medical exam in connection with Ms.

Pennington's worker's compensation claim on September 13, 2006.  (Tr. 666-669).  She reported

diffuse back and neck pain, "knots" forming in her back that go up to her neck, and soreness

across her upper trapezius muscles and in her hips.  (Tr. 666).  His examination showed "mild"

limitations of cervical, thoracic and lumbar motion.  "[S]trength testing appeared full throughout

bilateral upper and lower extremities; however, her strength testing would collapse with a give

away weakness" secondary to pain complaints.  (Tr. 668).  She "reported diffuse tenderness to

very light touch palpation throughout the cervical, upper thoracic and lumbar regions."  (Tr.

668). Plaintiff had normal reflexes and normal sensation.  (Tr. 668).  Dr. Doll concluded that

plaintiff's subjective complaints were "far out of proportion to her objective findings" and that

her "non-physiologic responses" suggested the possibility of a "non-organic basis" for her pain

complaints.  (Tr. 669).  He noted the possibility of myofascial pain syndrome, and opined that

she might require further evaluation.  (Tr. 669).  However, the  etiology was "unclear, especially

given so many inconsistent findings during today's exam."  (Tr. 669).  He recommended home

exercises and over-the-counter pain medication (Tr. 669).

Dr. David R. Lange performed an independent spine evaluation on October 3, 2006.

(Tr.469–474).  The neurologic exam was benign in both the upper and lower extremities, as was

the clinical examination of her neck.  He noted that she did have some signs of symptom

magnification.  (Tr. 473).  He did find some thoracolumbar kyphosis (spinal curvature) and

painful range of motion testing, but noted that plaintiff also had "marginally positive Waddell testing" and complained of tenderness "to extremely light touch." (Tr. 472). Dr. Lange reviewed the results of the prior MRI testing, and noted that the lumbar study suggested an old compression fracture. He also noted an abnormality of the disc at C5-C6, but was unsure "whether it even accounts for her neck symptoms." (Tr. 470). He did not recommend any medical treatment or surgery, and stated that plaintiff should be restricted to light physical demand work with occasional lifting of no more than 20 pounds. (Tr. 469).

On October 5, 2006, plaintiff reported to Dr. Mark Smith that Dr. Lange told her that she had a compression fracture which Dr. Lange believed was causing her pain. She claimed to have limited range of motion of the upper back. However, Dr. Smith again noted full range of motion of the neck and back. (Tr. 200).

In a report dated November 1, 2006, physical therapist Rob Landes stated that Ms. Pennington was reporting increased back pain, and that the reports of increased back pain coincided with the examination by Dr. Lange. She told the therapist that Dr. Lange told her that she had a "crushed disc." Since that time, she "has perseverated on the reported diagnosis and her disability." (Tr. 196). He again noted inconsistencies in her complaints, and noted that she reacted disproportionately to the lightest palpable touch. He cautioned that his objective findings may not be reliable due to her multiple inconsistences. (Tr. 196).

On November 2, 2006, Dr. Mark Smith noted evidence of exaggerated pain behavior in that she shows exaggerated response to light palpation, and stated that she has underlying psychosocial issues that contribute to her pain. He did not believe that her old compression fracture was causing her pain. (Tr. 194). Dr. Smith wrote a letter in which he stated that

plaintiff could return to work as of December 16, 2006, with no restrictions.  (Tr. 177).

Plaintiff was referred by Dr. Smith to a "work rehab program" at Heartland Rehabilitation.  Her initial evaluation was on November 6, 2006.  She was noted to have a "non organic component to her pain."  (Tr. 332).  After 23 sessions, she was discharged on December 14, 2006, with little improvement in her condition.  It was noted that she drove herself to the sessions and was able to attend to her personal hygiene.  She exhibited shakes or tremors "when asked to perform activity or when discussing her condition."  (Tr. 304-305).

Dr. David M. Peeples, a neurologist, performed an independent examination on December 4, 2006.  (Tr. 660-665).  Her neurologic exam was normal, and she had "fairly clear signs of symptom magnification."  Dr. Peeples observed that Ms. Pennington "sat comfortably through the history taking, however she had clear cut symptom magnification and pain behavior with movements about the exam room under direct observation. She moved much more freely in an unrestricted fashion when casually and indirectly observed."  (Tr. 661).  He recommended a restriction to light duty based on her age and small frame.  He remarked that "The closing down of the Maytag plant should also be factored in from a personal socioeconomic standpoint."  (Tr. 662).

Dr. Mark Smith saw plaintiff again on December 15, 2006, and noted that she was not getting any better.  He again stated that her old compression fracture was not causing her pain. He noted that she had underlying psychosocial issues and that she needed a psychiatric evaluation.  (Tr. 190).

Dr. Stacy Smith, a psychiatrist, performed an  independent medical evaluation on January 25, 2007.  (Tr. 383).  Plaintiff repeatedly denied having any psychiatric problems, and said her

problem was pain.  (Tr. 382 -383, 386).  She stated that she was an avid gardener, had 500-600

day lilies,  and could get down on the ground, but had difficulty getting back up.  (Tr. 383). She

was able to do activities such as washing dishes, cooking and taking walks, but it took her longer

than it used to.  (Tr. 385).  She "loved" to watch television and liked to read mysteries and sew.

(Tr. 388-389).  To relax, she "putter[ed] in the yard, and went to auctions and sales.  (Tr. 385).

She said she had difficulty concentrating and focusing, and was forgetful.  (Tr. 389).

     Dr. Stacy Smith diagnosed somatoform disorder, not otherwise specified,  and dependent

traits.  She assessed a GAF score of 57.  (Tr. 398-399). She opined that plaintiff is not "overtly

faking" and that "the vast majority of this is unconscious or semi-conscious. There may be some

exaggeration, but that is not the primary problem here. Unconscious dependency needs are being

met by taking on the illness role." (Tr. 399).  Dr. Smith found it  "interesting" that plaintiff

"continue[d] to find a way to perform her favorite hobbies, gardening and antique shopping. She

and her husband manage to get done what is necessary at home without paid help."  (Tr. 399).

The psychiatrist concluded that Ms. Pennington "can perform sedentary or light duty" work, but

predicted that, if "required" to do such work, plaintiff "would report an increase in symptoms

and report the inability to do" such work.  (Tr. 400)

     Dr. Richard T. Katz performed a consultative examination at Dr. Stacy Smith's request

on March 16, 2007.  (Tr. 524-531).  Dr. Katz reviewed her MRI results and did a physical

examination.  Her behavior throughout was described as "extremely somatoform" in that she

cried and groaned, and displayed severe pain behaviors no matter where he touched her.  (Tr.

528). He concluded that she has somatoform disorder and that there is no musculoskeletal

diagnosis that would explain her presentation.  (Tr. 529).  He cautioned that her "psychiatric

problems should not be misconstrued as myofascial pain." (Tr. 529). He also concluded that she

was capable of light and sedentary work. (Tr. 530).

Plaintiff began receiving counseling services at the Illinois Center for Behavioral Health

on December 4, 2007. (Tr. 420). The initial mental status assessment was that plaintiff had a

depressed and anxious mood, but she was otherwise normal. (Tr. 429). She

was well-groomed, maintained good eye contact, and had an "average" demeanor, "clear"

speech, "logical" thought content, "good" insight, "good" judgment, and no cognitive deficit,

delusions or other odd thoughts. (Tr. 429). The counselor, Sheri Craig, disagreed with the

diagnosis of somatoform disorder, and diagnosed her with major depression. (Tr. 432). Ms.

Craig assigned a GAF of 42. (Tr. 433). Plaintiff was treated at the Illinois Center for Behavioral

Health through October, 2008. (Tr. 723-726). She saw counselor Mary Ann Hilliard for

individual therapy sessions. She was also seen by two psychiatrists there. Both doctors

diagnosed major depression, and prescribed Cymbalta, Trazodone and Abilify. (Tr. 458-465,

717-722). In January, 2008, a psychiatrist assigned her GAF of 50. (Tr. 458, 464).

On August 8, 2008, Dr. Mark Smith filled out a form in which he indicated that plaintiff

had severe limitations. (Tr. 708-713). For instance, he stated that she could "never" lift. He

also indicated that these limitations had been present since "early 2006." (Tr. 713).

**6.      State agency physician physical assessment**

A state agency physician completed a physical functional capacity assessment. (Tr. 369-

376). She concluded that plaintiff was capable of performing light work in that she could

frequently lift 10 pounds, occasionally lift 20 pounds, stand or walk for 6 out of 8 hours, sit with

normal breaks for 6 out of 8 hours, and had no push/pull limitations. She found no manipulative

or postural limitations.  Based on plaintiff's history of COPD, she did limit her to avoiding concentrated exposure to fumes, odors, gases, etc.

The assessment was reviewed and affirmed by a second state agency consulting physician.  ( Tr. 418).

**7.      State agency consultant mental RFC**

A state agency consultant completed a Psychiatric Review Technique form on April 12, 2007.  (Tr. 401-413).  Plaintiff  was evaluated under Listing 12.07, Somatoform Disorders, and Listing 12.08, Personality Disorders.  With regard to the "B" criteria, she was noted to have only mild restriction of activities of daily living, and mild difficulties in maintaining social functioning and in maintaining concentration, persistence or pace.  She had no episodes of decompensation.  (Tr. 411).

The assessment was reviewed and affirmed by a second state agency consulting physician.  ( Tr. 415).

## Applicable Standards

In the Social Security context, a claimant is "disabled" when she has the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." **42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A).** A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. **42 U.S.C. §§ 423(d)(3) and 1382c(a)(3)(C).**

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled.  In essence, it must be determined (1) whether the claimant is presently employed; (2) whether the claimant has an impairment or combination of impairments that is severe; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience.  **See, *Schroeter v. Sullivan*, 977 F.2d 391, 393 (7ᵗʰ Cir. 1992); *Pope v. Shalala*, 998 F.2d 473, 477 (7ᵗʰ Cir. 1993); 20 C.F.R. § 404.1520(b-f).**

If the Commissioner finds that the claimant has an impairment which is severe and she is not capable of performing her past relevant work, the burden shifts to the Commissioner to show that there are a significant number of jobs in the economy that claimant is capable of performing. **See, *Bowen v. Yuckert*, 482 U.S. 137, 146, 107 S. Ct. 2287, 2294 (1987); *Knight v. Chater*, 55 F.3d 309, 313 (7ᵗʰ Cir. 1995).**

It is important to keep in mind the proper standard of review for this Court.  "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ."  **42 U.S.C. § 405(g).**   Thus, the Court must determine not whether plaintiff is, in fact, disabled, but whether the ALJ's findings were supported by substantial evidence; and, of course, whether any errors of law were made.  **See, *Books v. Chater*, 91 F.3d 972, 977-978 (7th Cir. 1996) (citing *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir.1995)).**  The Supreme Court has defined substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." ***Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427 (1971).**

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court *does not* reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ.  **Brewer v. Chater, 103 F.3d 1384, 1390 (7th Cir. 1997).**   In analyzing the ALJ's decision for "fatal gaps or contradictions," the Court "give[s] the opinion a commonsensical reading rather than nitpicking at it.  **Johnson v. Apfel, 189 F.3d 561, 564 (7th Cir. 1999)**.

<u>**Analysis**</u>

The ALJ properly followed the five-step inquiry.  He found that plaintiff has severe impairments, but that her impairments do not meet or equal a listed impairment.  The only point raised by plaintiff in her brief is that the ALJ erred in not finding that she met or equaled Listing 12.07, Somatoform Disorders.  Notably, plaintiff has not identified any errors with regard to the ALJ's credibility findings or his findings regarding plaintiff's residual functional capacity (RFC) at step four.  Arguments not raised are waived.  **Skarbek v. Barnhart, 390 F.3d 500, 505 (7th Cir. 2004).**

A finding that a claimant's condition meets or equals a listed impairment is a finding that the claimant is presumptively disabled.  In order to be found presumptively disabled, the claimant must meet *all* of the criteria in the listing; an impairment "cannot meet the criteria of a listing based only on a diagnosis."  20 C.F.R. §404.1525(d).

Plaintiff recognizes that, in order to be presumptively disabled under Listing 12.07, she must meet both the A and B criteria of the listing.  See, Doc. 18, p. 10.  The ALJ did find that plaintiff met the A criteria in that he found that she suffers from somatoform disorder, which he found was a severe impairment.  (Tr. 11).  However, he also found that plaintiff did not meet the

B criteria.

In order to satisfy the B criteria for Listing 12.07, plaintiff must demonstrate that her somatoform disorder results in at least *two* of the following:

      1. Marked restriction of activities of daily living; or

      2. Marked difficulties in maintaining social functioning; or

      3. Marked difficulties in maintaining concentration, persistence, or pace; or

      4. Repeated episodes of decompensation, each of extended duration.

Restrictions in the first three areas are ranked according to a five-point scale: none, mild, moderate, marked and extreme. 20 C.F.R. §404.1520a(c)(4). Here, the ALJ found that Ms. Pennington has "mild" restrictions in all three areas. Giving plaintiff the benefit of the doubt, he also found that she had suffered a panic attack in November, 2006, which would qualify as one episode of decompensation. Thus, the found that the B criteria were not met. See, Tr. 19-20.

Plaintiff first argues that the finding of only mild restrictions on the B criteria is incompatible with a finding that plaintiff's somatoform disorder is severe. She in incorrect. 20 C.F.R. §404.1520a(d)(1) provides:

> If we rate the degree of your limitation in the first three functional areas as "none" or "mild" and "none" in the fourth area, we will generally conclude that your impairment(s) is not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in your ability to do basic work activities (see § 404.1521).

Section 1520a(d)(2) goes on to explain how the Commissioner determines whether a severe mental impairment "meets or is equivalent in severity to a listed mental disorder." It is clear that the regulatory scheme contemplates that the finding of a severe mental impairment does not preclude a finding of only mild limitations on the B criteria.

Plaintiff suggests that the ALJ based his findings of mild limitations only on the

Psychiatric Review Technique form completed by a state agency consultant.  The meaning of

this suggestion is unclear.  In any event, this suggestion is incorrect.  The ALJ's detailed

decision indicates that he considered the records of Dr. Mark Smith, Dr. Stacy Smith, both

physical therapy providers and the various independent medical examiners, as well as the records

from  Illinois Center for Behavioral Health (Franklin-Williamson Human Services).  In addition,

he considered plaintiff's testimony and her statements in the Activities of Daily Living

Questionnaires.

Lastly, plaintiff argues that her GAF score of 50, which was assessed at  Illinois Center

for Behavioral Health (Franklin-Williamson Human Services) indicates that she has more than

mild limitations on the B criteria.  This argument also fails.  First, a GAF score "does not reflect

the clinician's opinion of functional capacity," and the ALJ is not required to rely on it to assess

whether a claimant is disabled.  ***Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010)**.  Secondly,

the mental health providers at Illinois Center for Behavioral Health who assigned the GAF score

rejected the diagnosis of somatoform disorder.  Instead, they diagnosed major depressive

disorder.  (Tr. 430, 432, 458, 464).  In order to be found presumptively disabled, the limitations

represented by the B criteria "must be the result of the mental disorder described in the

diagnostic description."  20 C.F.R. Pt. 404, Subpt. P, App.1(12.00 Mental Disorders).  Plaintiff

does not argue that she met or equaled the listing for major depressive disorder.

In a claim for Social Security disability benefits, the claimant bears the burden at step

three of the analysis of showing that she meets or equals a listed impairment.  ***Ribaudo v.***

***Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006).**  Plaintiff has not carried that burden here.

### Recommendation

For the reasons discussed above, this Court recommends that the final decision of the Commissioner of Social Security finding that plaintiff Vickie S. Pennington is not disabled, and therefore not entitled to Disability Insurance Benefits, be **AFFIRMED.**

Objections to this Report and Recommendation must be filed on or before **January 25, 2011.**

**Submitted:  January 7, 2011.**

**s/ Clifford J. Proud**
**CLIFFORD J. PROUD**
**UNITED STATES MAGISTRATE JUDGE**